UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

| | |
|---|---|
| United States *ex rel.* Per Bukh, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Guldmann, Inc. | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

1:11-cv-03701
Judge James F. Holderman
Magistrate Judge Geraldine Soat Brown

**Filed Under Seal
Pursuant to
31 U.S.C. §§ 3729** *et seq.*

**FILED**

JUN − 1 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from the false claims and statements made by Guldmann, Inc. ("Guldmann" or "Defendant") to the U.S. Government, in violation of the Federal False Claims Act (the "FCA"), 31 U.S.C. §§ 3729 *et seq.,* as amended.  Guldmann is the U.S. subsidiary of V. Guldmann A/S ("Guldmann Denmark").

2.      Since 2004, in separate awards, Guldmann has sold an estimated $20-25 million worth of medical equipment and supplies to the Department of Veterans Affairs (the "VA").

3.      This action arises out of Guldmann's false or fraudulent conduct in providing false information to the VA about its commercial pricing practices and the origination of the products being sold to the Government.  Specifically, the false claims detailed herein took two forms:  (1) Guldmann offered its commercial customers a steeper discount than that offered to the U.S. Government, in violation of the "best price" clause; and (2) Guldmann sold products to

1

the U.S. Government that were not manufactured in designated countries, in violation of the Trade Agreements Act ("TAA"). Relator Per Bukh has direct and independent knowledge of these violations.

4.      The FCA, originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Act. Congress acted after finding that fraud in federal programs and procurement is pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

5.      The Act provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal for 60 days (without service on the Defendant during such 60-day period) to enable the Government (a) to conduct its own investigation without the Defendant's knowledge and (b) to determine whether to join the action.

6.      The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of

strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the FCA.  Pub. L. No. 111-21, 123 Stat. 1617 (2009).

7.      Based on these provisions, the Relator seeks to recover damages and civil penalties arising from Guldmann's presentation of false claims to the U.S. Government, after knowingly violating the best pricing clause. The Relator also seeks to recover damages and penalties arising from Guldmann's sale of goods from non-designated countries to the U.S. Government.

## PARTIES

8.      Relator Per Bukh is a Danish citizen, but was granted permanent residency by the United States in June 2008.  He joined Guldmann in October 2004 as its Controller and served in this position until March 2010.  As such, he was responsible for preparing the Income Statement, Balance Sheet, various Forecasts and Cash flows. In addition to that he was responsible for checking the margins on orders and general cost controlling. These tasks were done in close cooperation with the Sales and Logistics Departments.  In this capacity he gained direct and independent knowledge of the allegations contained in this Complaint.

9.      Defendant Guldmann is located at 5525 Johns Road, Suite 905, Tampa, Florida 33634-4307.  On June 21, 2004, it entered into Contract No. V797P-4680a with the VA for the sale of medical equipment and supplies.  The Contract had a five-year term, was renewed for another five years in June 2009, and currently expires on June 21, 2014.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.  It also has subject matter jurisdiction pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title, 31, United States Code.

11.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant entered into the Contract with the VA in this district.

12.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Contract, with the VA National Acquisitions Center, was signed and overseen in this jurisdiction.

## LEGAL BACKGROUND

*Pricing Regulations*

13.     The Federal Acquisition Regulations System ("FAR") codifies and publishes uniform policies and procedures for acquisition by all executive agencies.  FAR 1.101.

14.     The FAR is prepared, issued, and maintained, and the FAR System is prescribed jointly by the Secretary of Defense, the Administrator of General Services, and the Administrator, National Aeronautics and Space Administration, under their several statutory authorities.  FAR 1.103(b).

15.     The GSA may delegate certain responsibilities to other agencies, and has delegated authority to the VA to procure medical equipment and supplies under the VA Federal Supply Schedules Program (the "VA FSS").

16.     The VA FSS consists of eight schedules.  Schedule 65IIA deals with medical equipment and supplies.

17.     The starting point for price negotiations on the VA FSS is the Most Favored Commercial Customer ("MFC").  The MFC is defined as "that customer or class of customer which receive(s) the best discount and/or price arrangement on a given item from a supplier."  It includes any entity which does business with the vendor. Vendors/contractors on the VA FSS must provide the Government with the "best price," *i.e.,* the lowest net price at which a vendor sells to its MFC without regard to quantity, terms and conditions.

18.     All VA FSS contracts are multiple award, indefinite demand – indefinite quantity ("ID-IQ") and national in scope.  These contracts are available for use by all government agencies.

19.     The Veterans Affairs Acquisition Regulation System ("VAAR") implements and supplements the FAR.  VAAR 801.101(b).  The FAR and VAAR apply to all VA acquisitions made with appropriated funds and are to be used together.  VAAR 801.104(a); 801.104(b).

20.     In June 2004, Guldmann entered into Contract No. V797P-4680a with the VA. This enabled Guldmann to sell its products on the VA FSS, on Schedule 65IIA.  Guldmann provided a Retail Price List and a Commercial Sales Practices Format ("CSP-1").  On the CSP-1, Guldmann indicated that "Value Added Resellers/Distributors" received a 50% discount on the retail price.

*The Trade Agreement Act*

21.    The TAA requires that all goods sold to the U.S. Government must be manufactured in the United States or a TAA designated country.   *See* 19 U.S.C. § 2512(a)(1)(A)(i).

22.    The FAR provision interpreting the TAA requires contractors to deliver only end products that were manufactured in the United States or certain designated countries.   FAR 52.225-5(b).

23.    "End products are those articles, materials, and supplies to be acquired under the contract for public use." FAR 52.225-5(a)(1)(2).

24.    According to the End Product test, to be eligible for purchase by the Government, an end product must either be:   (a) mined, produced, or manufactured in the U.S. or a "Designated Country"; or (b) "Substantially Transformed" in the U.S. or a "Designated Country."   "Substantial Transformation" means that the product is made into a "new and different article of commerce" with a name, character, or use distinct from that of the article or articles from which it was transformed.   An article is not "substantially transformed" by minor manufacturing or combining processes that leave the identity of the article intact.   The assembly process must be complex and meaningful.

25.    The categories of "designated countries" are:   (1) WTO member and GPA signatory, (2) NAFTA country, (3) Caribbean Basin Country, (4) Least Developed Country, and

(5) for Department of Defense purchases, one of the 21 countries with which the U.S. has a "Memorandum of Understanding" ("MOU").

26.     Neither China nor the Ukraine is a TAA-designated country.  Taiwan was not a designated country until August 11, 2009.

## FACTUAL ALLEGATIONS

*Best Pricing to Alpha Modalities*

27.     In negotiating the Contract, Guldmann provided the Government with a CSP-1, which indicated what discounts it provided to different classes of customers.  "Discounts" includes, but is not limited to, rebates, quantity discounts, and purchase option credits.  The CSP-1 indicated that the highest discount Guldmann provided was 50% off to its value added resellers/distributor customers, with no minimum quantity sold and no additional discounts, rebates or concessions provided.  Guldmann provided the Government an additional 1% discount on orders of 15 pieces or more of the same item number on the same purchase order for certain products.  Guldmann also indicated that its MFC was the category of "Distributors."  Therefore, the Government should always receive a lower price than Guldmann's distributor customers.

28.     Not long after entering into the Contract with the VA, Guldmann began a "rebate" program with Alpha Modalities LLC ("Alpha").  Alpha is a distributor of medical equipment, including ceiling hoists and slings, which is based in Seattle, Washington.

29.     The program was twofold:  (1) it gave Alpha an additional 10% discount (over the 50% discount off the manufacturer suggested retail price ("MSRP")) off of total sales on all products, less freight costs; and (2) it offered Alpha the low price of $1,009.62 each for all orders

of 20 or more motors for its ceiling mounted hoists (hereinafter "motors").  For purchase orders of 20 or more motors plus other products, the "special" price of $1,009.62 for each motor is deducted from the total sale, and the general 10% discount is then given to the remainder of the purchase order.

30.     In its simplest terms, for orders of 20 or more of the GH2HD motors, Guldmann offered Alpha a 73% discount off of the MSRP of $3,780.  At the time, Guldmann only offered the VA a 52% discount off the MSRP and it never afforded the VA the additional discount.

31.     On October 10, 2005, Alpha's Tim Kuzma wrote to Guldmann's President Anders Dreschler complaining of increased competition and requesting a discount on the GH2HD motor.  Mr. Kuzma asked for a fixed price of $1,400 per item until February 1, 2006. This price ($1,400 per unit) was less than the per unit price offered to the VA.

32.     Instead of replying that he was contractually unable to do this, Mr. Drechsler internally requested the profit margin on the item if it was sold at $1,400, $1,200 or $1,000, before settling on a price of $1009.62.

33.     As documented in several emails of this time period, Guldmann was aware of its requirement to provide the VA with the "best price" and knew that the offer to Alpha of only $1,009.62 per unit (which went even lower, to $887 per unit at one point) and the general (minimum) 10% discount on all other items violated this obligation.

34.     Nonetheless, Guldmann instituted this "general 10% discount" and the "special pricing" to Alpha.  It did so by issuing credit memos to Alpha.  Thus, Guldmann invoiced Alpha at the proper rate of MSRP minus 50% for the order of GH2HD motors and other items.

Separately, Guldmann then issued to Alpha credit memos in the amount of the difference between the traditional rate of MSRP minus 50% and the "special pricing" rate of either $1,009.62 for orders of 20 or more GH2HD motors or an additional 10% discount for orders of less than 20 GH2HD motors and other items.  Ideally, Alpha deducted the credit memos from the invoices, and thus never paid the full amount of the invoices.  At times, however, the Credit Memo was delayed, which caused Alpha to pay the invoice in full and then deduct the Credit Memo from a later invoice.

35.     Specifically, Guldmann issued invoice number 32292 in the amount of $23,527.68 to Alpha.  Guldmann then subtracted the $1,700 freight charge, for an adjusted total of $21,827.68.  Next, Guldmann issued Alpha a credit memo for the 10% rebate, *i.e.,* $ 2,182.77. Similarly, Guldmann issued credit memos of $2,792.20 from invoice number 32365 in the adjusted amount of $27,922.03; $4,886.50 from invoice number 32476 in the adjusted amount of $48,864.96; and $3,385.99 from invoice number 32518 in the adjusted amounted of $33,859.86. Notably, in invoice number 32518, Guldmann corrects an error from Alpha's related purchase order.  In the purchase order, Alpha orders 9 motors for $1,009.62 each.  This is incorrect for two reasons:  (1) orders of less than 20 motors are only subject to the 10% discount; and (2) Alpha apparently forgot that it was only supposed to receive a 50% discount off the MSRP.  On the subsequent invoice, Guldmann corrects this sale for 9 motors at $3,937.50 each, minus the 50% discount.

36.     Sometimes Alpha received both the 10% discount and the special pricing on the motors.  For example, on invoice 32476, the invoice amount of $115,872.16 consists of $60,577.20 worth of motors (obtained at the special price of $1,009.62 each) and $55,294.96

worth of other products.   The adjusted price of $48,864.96 ($55,294.96 minus $6,430.00 in freight) was then discounted an additional 10% or $4,886.50.

37.     Continuing its special price to Alpha, on February 21, 2006 Mr. Drechsler sent an email reminding Guldmann employees of Alpha's "special price on GH2HD [motors] when ordering more than 20" pieces.  He claimed that this was an "important project to bring down inventory."

38.     By email dated September 15, 2006, Guldmann's Mr. Drechsler confirmed a conversation that he had with Alpha's Mr. Kuzma regarding another special pricing discount. Specifically, Guldmann confirmed a price of $887.00 each for an order of 160 pieces of GH2HD AC item number 120001-2023 in one shipment.  This offer was good for 60 days.  Once again, the VA was not offered similar terms and conditions.

39.     On October 3, 2006, Guldmann issued credit memo number 26482 to Alpha in the amount of $63,397.65. This covered "Referrals through 9.30.06," with referrals meaning discount on purchases.

40.     In addition to the two discounts methods (the general 10% and the special pricing discounts on motors described above), on May 2, 2007 Guldmann authorized an additional 14% discount to Alpha on another product, the midi rails.  Once again, the VA was not offered a similar discount.

41.     These long-standing discount practices for Alpha were affirmed in an October 17, 2008 email.  In it, Guldmann's Vice President Linda Bowman confirmed that "the purchase of

20 or more motors will be sent at the reduced price of $1,009.62 and are not subject to the 10%

rebate," which is used for purchases of less than 20 motors and purchases of all other products.

42.     Throughout this period, Guldmann was well aware of its pricing obligations to the

VA.  In a November 3, 2008 email, Mr. Drechsler contemplated Guldmann's Danish Financial

Manager's request to change the average profit margin on material vs. installation.   Mr.

Drechsler wrote: "We can't start showing a discount of 60% (for example) in XAL[Guldmann's

accounting system] just to show a certain margin % split between material and installation.  This

would give the VA the option to insist on a 60% discount on material going forward but also

retroactively, because they should be offered the best price.   Our contract is up for renewal

before June 2009 so it is prime-time for an audit right now"

43.     Also, in late 2008, Alpha's Mr. Kuzma asked Guldmann about Guldmann's

pricing for calendar year 2009 and whether there would be any price increases on the motor.  In

an October 21, 2008 email, Guldmann's Ms. Bowman assured Mr. Kuzma that the motors would

not increase in price and that Guldmann can "keep your special pricing for the motors without

change."

44.     In an April 16, 2009 email, Alpha's Jose Berger wrote that he cannot pay his

pending invoice because he was still waiting for the "referral credit memo" from Guldmann.

Guldmann's Credit Memo would be subtracted from the pending invoice to give the proper

amount that Alpha must pay Guldmann.  In an April 17, 2009 email, Alpha indicated that it was

willing to pay invoice number 34271, minus credit memos 34491 and 34608, and would apply

the credit memo in question to a future invoice.

45.     Under this arrangement, Guldmann could later point to the invoice originally issued to Alpha, which indicated a net price of MRSP minus 50%.

46.     Also in April 2009, Guldmann's Ms. Bowman consulted an attorney regarding government audits.   Based on his advice she came up with a plan on how to deal with Guldmann's sales to Alpha and other distributors at discounts of higher than 50%, in situations where Guldmann had not been able to hide these impermissible discounts.   Ms. Bowman and other Guldmann executives were worried that Guldmann would fail an audit by the VA.

47.     Ms. Bowman then admitted, during a telephone call to a VA employee, to a couple of insignificant examples of deviations from the best price.   She claimed to have given a commercial customer named Christiana Care a price on slings below what is offered to the VA, but to have corrected this problem.   In doing so, Guldmann successfully avoided an impending audit by the VA.

48.     In truth, in the 3 year period from 11-18-06 to 11-17-09, Guldmann impermissibly rebated nearly $1.1 million to Alpha through its special pricing and general 10% discount schemes.   Overall sales to Alpha should have been $4.5 million during this time.   At the same time, the VA had purchased $14 million worth of products from Guldmann.

49.     After several oral warnings to Mr. Drechsler regarding the potential consequences of Guldmann's blatant violations of its pricing obligations to the VA, on April 23, 2009, Ms. Bowman sent him a press release announcing NetApp's $128 million settlement with the Government regarding allegations of FCA violations.   The NetApps case involved "best price" violations.

12

50.    This special pricing for Alpha continued through March 2010.   Specifically, Guldmann issued invoice number 36928 to Alpha in the amount of $75,600.00.  Guldmann later issued Credit Memo number 37855 in the amount of $35,215.20 to Alpha's account.  This credit memo reflected the additional discount of $880.38 per unit for the order of 40 GH2HD motors. Alpha then deducted the amount of this Credit Memo in the payment of invoice 37370 in the amount of $76,314.00 and paid the balance of $41,098.80 on check number 7560.

51.    The general discount of 10% and the special pricing is believed to continue today.

**Pricing to Guldmann's Other Commercial Customers**

52.    Guldmann also offered special pricing to its other commercial customers, pricing that it again failed to offer the VA.

53.    In January 2006, Guldmann offered an additional 10% discount – over and above the standard 50% discount – to New England Medical Systems ("NEMS") on orders related to the Partner Group.  The Partner Group owns Massachusetts General Hospital, Brigham Woman's Hospital and Spaulding Hospital in Boston, Massachusetts.   The VA was not offered this additional 10% discount.

54.    In addition, NEMS was also offered a special discount price of an additional 23% off the retail price of rails, brackets, slings etc.  The VA was not offered this price.

55.    In July 2009, Guldmann sold six ceiling hoists (materials and installation) to Gwinnett under Purchase Order No. C156465.  Guldmann offered Gwinnett a 72% discount on the actual ceiling hoists, with a permissible 50% discount on installation and other materials.

13

56.     Again, in August 2009, Guldmann sold seven ceiling hoist systems (materials and installation) to Gwinnett.  By providing Gwinnett with a 51% discount on materials (above the maximum allowed 50% discount), Guldmann only charged $159.93 for installation in each room, for a total of $1,119.53 for installation for the seven rooms.  Installation is usually $600.00 to $1,000.00, per room.  Thus, Guldmann gave Gwinnett a steep and impermissible discount on its Purchase Order No. C161168.

57.     In September 2009, Guldmann sold Hoar Construction several products, including motors, rails and brackets, at a 65% discount.

58.     In December 2009, Guldmann sold hoist systems to University Hospitals (purchase order number 710894) at such a steep discount that even if it charged $0.00 for installation, the materials alone would entail a 51% discount.  According to the VA Contract, the highest allowable commercial discount is 50%.

59.     As described above, Guldmann's internal correspondence is replete with references to the "best price" requirement, *i.e.,* that Guldmann is required to offer the Government its best price.  Thus, Guldmann was well aware that each time it offered Alpha or any other commercial customer a discount greater than 52%, it was required to offer the Government a similar discount and failure to do so was a contract violation.

**_Guldmann's Request for Modification_**

60.     On September 17, 2009, Guldmann sent a Request for Modification to VA Contract Specialist Richard M. Amesquita to add two new products to Contract V797P-4680a. The products included an updated version of its ceiling lift motor GH3+ and a lifting hanger

14

specific to the GH3+ motor.   The modification package included:   (1) the Request for Modification Form;   (2) Excel Spreadsheet for Product Additions Price Proposal;   (3) Product/Price Comparison; (4) Guldmann MSRP Pricelist; and (5) the GH3 Brochure.

61.     This September 17, 2009 Request for Modification contains many false statements.   These false statements include:   (1) the assertion in Block E on page 2 that the country of origin for all proposed products is Denmark as per FAR 52.225-5 Trade Agreements Act (November 2007); (2) the assertion in Block G that the Place of Manufacturing is "Graham Bells Vej 21-23 A, DK 8200 Arhus N;" (3) the assertion in Block M regarding proposed pricing that Guldmann's "written discounting policies (standard commercial sales practices in the event [Guldmann does] not have written discounting policies), *are the discounts and any concessions which [Guldmann] offer[s] the Government equal to or better than [Guldmann's] best price* (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions (emphasis in original); (4) the assertion in Block N regarding discount policies that Guldmann does not have "any deviations from [its] written policies or standard commercial sales practices disclosed in the above chart [that] ever result in better discounts (lower prices) or concessions than indicated;" (5) the assertion in Block Q regarding additional discounts that Guldmann does not offer any "additional discounts/concessions, including prompt payment discounts, annual rebates, etc." to its commercial customers.

62.     These statements were false because:  (1) the GH3 motor was manufactured in China, not Denmark; and (2) Guldmann offered Alpha, NEMS, Hoar and Gwinnet, *inter alia*, better pricing and additional discounts than that which it offered to the Government; and (3)

15

Guldmann also granted Alpha 45 days to pay in full, while the Government had to pay in 30 days.

63.     The CSP-1 Chart attached to the Request for Modifications also contains false statements.   Column 2, titled "Discount", indicated that Value Added Resellers/Distributors (defined as any entity, except the Federal Government, which acquires supplies or services from the Offeror) receive a 50% discount off the MSRP.   Further, Columns 3 and 5 indicated that there is no quantity/volume or any other discount (including a prepaid discount or annual rebate) offered to non-Government customers.

64.     These statements were false because: (1) many distributors and other commercial customers receive a discount of greater than 50% off the MSRP; and (2) Guldmann offered Alpha a quantity/volume discount that it did not offer the Government.

65.     The false Request for Modification was signed by Guldmann's Vice President Ms. Bowman and dated September 17, 2009.

66.     Guldmann violated the FCA in two manners with this Request for Modification: by lying about both where the product was manufactured and the fact that it provided Alpha, and some other commercial customers, with a better price than it provided the Government.

***TAA Violations***

67.     Guldmann intentionally and knowingly sold products from non-TAA compliant countries to the U.S. Government in violation of the TAA.

68.     Upon information and belief, in its original Contract and again in its September 2009 Request for Modification, Guldmann claimed that its products were manufactured in Denmark.   These statements were not true.

69.     Beginning in 2005, Guldmann shifted the manufacturing of its products to Ukraine, Taiwan and China.

70.     Also, beginning in February 2006, Guldmann had slings shipped from Taiwan to Tampa, Florida.   In an apparent attempt to hide the origination of the slings, Guldmann Denmark was invoiced for all shipments from Taiwan to Florida.   Taiwan was not added to the TAA-designated country list until August 9, 2009.   Therefore, Guldmann should not have sold any products manufactured in Taiwan to the VA or any other Government entity.   Slings were also produced in China, which is not a TAA-designated country to this day.

71.     There is no "substantial transformation" of the slings in the United States.   The slings are merely repackaged in Tampa, Florida in order to hide the origination prior to sale to the Government and other U.S. customers.   By having the invoices sent to Denmark, Guldmann is attempting to hide the origination of the slings and circumvent the requirements of the TAA.

72.     Guldmann also manufactured components for the hosts and brackets in Ukraine and China.

73.     After working directly with Chinese subcontractors in early 2007, in December 2007 Guldmann hired a Chinese company owned by SinoScan A/S (Denmark), to oversee the manufacturing of the motor and its more than 100 components/parts.   SinoScan coordinates

between Guldmann and the Chinese factories. The GH3 motor was always manufactured in China, which is not a TAA-designated company.

74.     The motors are sent from China to Guldmann Denmark, for assembly and shipment to the U.S.

75.     Thus, Guldmann's statement in its September 2009 Request for Modification that the GH3 motor was manufactured in Denmark was false. As of December 2007, a major part of the product development and the production takes place in China, with only the assembly taking place in Denmark. Thus, every sale of the GH3 motor to a VA facility was in violation of the TAA.

76.     In publications throughout the world, Guldmann executives tout its production facilities in the Ukraine, Taiwan and China. In the Autumn 2007 edition of the "Ukraine News," an article details the moving of Guldmann Denmark's "machinery and production to Ukraine." According to Carsten Guldmann, Guldmann's Managing Director, the establishment of production in Ukraine has been a success and led to a decrease in the company's production costs. In the January/February 2010 edition of "Automatik & Proces," Senior Project Manager Henning Kristensen described Guldmann Denmark's process of hiring SinoScan A/S in China in December 2007 after first working directly with Chinese subcontractors.

77.     It is only in America that Guldmann claims that all of its products are manufactured in Denmark.

78.     In sum, since 2005 Guldmann has violated the FCA in two manners:   (1) Guldmann offered its commercial customers a steeper discount than it offered to the

Government; and (2) Guldmann sold products to the U.S. Government that were not manufactured in designated countries, in violation of the TAA.

## COUNT I

### *(False Claims Act, 31 U.S.C. §3729(a)(1)(A))*

79.     Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

80.     By virtue of the acts described above, Defendant Guldmann knowingly submitted, caused to be submitted and continues to submit and to cause to be submitted false or fraudulent claims for payment and reimbursement by the United States Government by knowingly or recklessly making false statements about the most favored customer discount and the country of origin of products offered for sale to the U.S. Government that did not originate in the United States or a designated country as defined by the TAA.

81.     The United States, unaware of the falsity of the claims and/or statements made by the Defendant and in reliance on the accuracy thereof, paid for the aforementioned false claims because the Defendant intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country, despite falsely certifying Defendant's compliance with the provisions of the TAA.   The Defendant also knowingly sold products to its other commercial customers at steeper discounts than it offered to the Government.

82.     As set forth in the preceding paragraphs, Defendant violated 31 U.S.C. § 3729 and has thereby damaged and continues to damage the Government by its actions in an amount to be determined at trial.

## COUNT II

### *(False Claims Act, 31 U.S.C. §3729(a)(1)(B))*

83.     Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

84.     By virtue of the acts described above, Defendant Guldmann knowingly made, used or caused to be made or used, and continues to make or use or cause to be made or used, false statements to obtain Federal Government payment for false or fraudulent claims because the Defendant falsely certified that all products it sold and offered for sale to the United States Government originated in the United States or designated countries as defined by the TAA, or Defendant certified that it truthfully and honestly provided accurate information to the U.S. Government regarding the country of origin of products that it was offering for sale to the Government, when in fact the Government was knowingly provided false and misleading information.  These were material misstatements that violated the TAA and/or frustrated the efforts of the U.S. Government to achieve its goals and policies under the TAA.

85.     Defendant also made false statements as to the rates and discount procedures available to its commercial customers.

86.     The United States was unaware of the falsity of the statements made by the Defendant and relied on the accuracy thereof because the Defendant intentionally or with gross

disregard for the truth misrepresented to the Government the material issue of Defendant's conformity with the requirements of the TAA.

87.     As set forth in the preceding paragraphs, Defendant violated 31 U.S.C. § 3729 and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## PRAYER

88.     WHEREFORE, on Counts I and II, Relator on behalf of himself and the United States Government pray:

(a) That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of $5,500 to $11,000 for each violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b) That the Relator be awarded all costs incurred, including reasonable attorneys' fees;

(c) That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

(d) That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount that the Court decided is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or settlement of the claim;

(e) That the Relator be awarded prejudgment interest;

(f) That the United States Government and the Relator receive all relief, both law and in equity, to which they may reasonably appear entitled.

## JURY DEMAND

The Relators hereby demand a trial by jury.

Respectfully submitted,

_____

Patrick J. Keating, Esq. (IL Bar 6211380)
Simmons Browder Gianaris Angelides & Barnerd LLC
230 West Monroe, Suite 2221
Chicago, Illinois  60606
(312)759-7500

Derek Y. Brandt, Esq. (IL Bar 6228895)
Simmons Browder Gianaris Angelides & Barnerd LLC
One Court Street
Alton, Illinois  62002
(618) 259-2222

Of Counsel:
Melissa A. Roover, Esq.
Jamie Bennett, Esq.
Ashcraft & Gerel, LLP
4301 Garden City Drive
Suite 301
Landover, MD  20785
Tel: (301) 459-8400